May it please the Court, Your Honor, I'm Eugene Olofsky. I've been appointed to argue the appeal for the defendant, Tin Nguyen. He's the appellant. Just so the Court knows, Defense Counsel has divided up their argument time of 30 minutes among the five of us. We're each taking six minutes. We've also divided the arguments by subject matter pursuant to the Court's order to try to give some sense to this. So I'm going to be arguing the jury instructions. Mr. Luckl, second, will be arguing the double jeopardy issue. Mr. Johns, third, will be arguing the vouching issue. And then we'll be followed by Mr. Searles and Mr. Jordan who are arguing specific issues that are specific to their clients. Okay. Thank you. Your Honor, I'd like to use my argument time on the jury instructions to give the Court a little more help in showing why the error that we point out in our briefs actually constitutes a plain error. It is the defendant's burden to show that the jury instructions on counts one and two contained an error that was plain, that is clear or obvious, and that affected substantial rights. Under the Alano case, an error can affect substantial rights if it's not harmless, that is prejudicial, or if it falls into a category of mistakes that are so serious that the Court thinks it just should reverse them regardless of prejudice, or maybe it might be in a category where prejudice should be presumed. And then finally, of course, the Court does have discretion under the plain error standard, and it typically, it does exercise its discretion to reverse when it determines that the error is so serious that it seriously affects the fairness or the integrity of the judicial proceedings. Now, in this case, let me address count two first because that came with the bigger sentence, and that's the Hobbs Act conspiracy jury instructions. The error in the Hobbs Act jury instructions was that it omitted two elements of the offense, and what we have done in trying to show that the error in the jury instructions was structural is we have tried to show that this is a special category of error under Alano that doesn't really lend itself to prejudicial error review. There were two elements missing, and what's important about that is that it takes the case out of Nader against United States. The United States held that the omission of one element from a jury instruction is not necessarily a structural error, although I would posit to the Court that it could be a structural error, say, if the statute had only two elements and the instruction omitted one of them, it would be an omission of 50 percent of the elements, whereas Nader, if you look at it as an 80 percent case, there were five elements and the jury didn't get one, but it got 80 percent. I would say that until there's more guidance from the Supreme Court, the Court should treat any sort of omission of more than one element as really being a structural type of error, in other words, an error that so vitiates your confidence in the jury instruction that you just won't go there. As Justice Scalia points out in the dissent in Nader, it is a slippery slope. How many elements can we allow a jury not to get before we'll not use the harmless error analysis? So I think we have to be very careful. The two elements that were omitted are quite clearly required by the law. The one is the requirement that there be a showing of impact on interstate commerce, of course. It was clear under Acheson, certainly, that even a conspiracy must be shown to have a potential impact on interstate commerce. It's a separate element. The government makes an argument that somehow it's included in the description of the offense, but we really think that it's not, and we think the Court won't find it. The second element that is omitted requires a few more building blocks, but we say that the Court omitted the overt act requirement of the Hobbs Act conspiracy instruction. Now, the government says, well, look, even if that's an error, how could it be a plain error, because the circuits are split on whether an overt act is required, and besides, the Ninth Circuit hasn't ruled on it. The government is correct in stating that, but I would say that what is clear, surely after the Lopez case in 1995, is that Congress cannot reach, under the Commerce Clause, non-economic conduct that has absolutely no impact on interstate commerce. And I would say to the Court that it's quite clear that a conspiracy that has no overt act in furtherance of it can't possibly have a potential impact on interstate commerce. It could have, it would have purely an imaginary or a hypothetical effect, but you need the overt act. You need the objective manifestation of the conspiracy. Mr. Orlovsky, what do we do with the verdict forum that shows that, in fact, there were goods that were moved across the state line? That is, we know, in fact, from the verdict forum that interstate commerce was involved. Your Honor, I think we do know that, and I think it's clear, but I think that when we're in the realm of structural error, we really are not looking at the weight of the evidence. We're looking at whether we have confidence that the jury was instructed. If I understand your argument correct, it's hinged on this so-called structural error, that is, no matter what else happened, we have to reverse. And is that a yes or a no? Yes, it is. In what case do you rely on that this is structural error? I'm relying on the principle that existed certainly before the Nader case, which is the idea that a defendant is entitled to have all of the elements of a crime given to the jury. Nader threw that into question somewhat by saying it may not be a structural error to have one element missing, and I'm saying that, well, you shouldn't go any farther than to go down and allow two elements to be considered not a structural error. Moreover, in the jury instruction findings, there's no particular findings about the movement of commerce under count two, which is the Hobbs Act conspiracy count. And I would say to the Court that a mere conspiracy, a naked conspiracy in agreement with no act in furtherance of it, can never have an impact in interstate commerce. If the four of us make an agreement to move that pitcher of water to the bench there, unless one of us does something about it, we can have an aggregated million of those agreements and nothing in this room is going to change. Same with the impact in interstate commerce. There will be none. And so by saying that there are two elements... What did you do with Shabani? I'm sorry? What did you do with Shabani? So Shabani is the case where the Supreme Court said that as a matter of construing the statute, because the statute doesn't say overt act, we're not going to find that there's an overt act in it. And indeed, the cases that have construed the Hobbs Act conspiracy as not containing an overt act requirement do rely on Shabani. I say that Shabani is a different statute. It was passed in 1970, whereas the Hobbs Act was passed in 1948 at the same time of the codification of the Criminal Code, which contains Section 371. But more importantly, I would say that the difference with the Hobbs Act is that there is this interstate commerce constraint and that you can't read the overt act requirement out of it because you simply won't have an impact on interstate commerce. Shabani, don't forget, also involves drugs. And I think we've always... The courts have always said, look, there's been specific congressional findings... This is a lot of responsibility to put on district judges to not only assume that Supreme Court cases that seem to be lost on point have been superseded, but this constitutional argument would apply and would make any public objection unconstitutional. I mean, you know, that's not the kind of stuff that plain is made of. I don't think it's that much of a burden, Your Honor. I mean... There were plenty of lawyers at the defense table, and this was so plain. I saw one of them jump up and say, hey, look, this is fine. Your Honor, this is a very difficult, complex case. There were interpreters. There were a lot of things going on, and so I could understand why a very important issue... The lawyers didn't speak English? The defendants didn't speak English, and so the lawyers... The lawyers didn't need interpreters. It's not like they had to get interpreters to read the reports or anything like that, right? But certainly with all the issues at play at the trial, you could see how an issue like this might not have been brought to the lawyer's attention immediately. And so what I would say is that if you do consider, especially given the constraint of Lopez and the constraint on federal power that Lopez requires in terms of, you know, it's a good... I'm not going to... I mean, what I'm saying is generally in plain-air cases, it's not strange that you look at it and once it's pointed out, you say, duh, you know, it really was an error. You know, here you have... I mean, you've been very good and very creative and very articulate, but you have to work pretty hard to come up with your explanation. Maybe it's a good one, maybe it's not a good one, but you've got it split in the circuits. You've got at least the Supreme Court opinion articulating a contrary rule, and a pretty good argument that maybe that construction would be a prosecution under Lopez, but that's all you have. Your Honor, I would say that it's perhaps taking a while for the Lopez and Morrison principles to seep down into the courts of appeals, but I think that once you do put Lopez and Morrison together with the Hobbs Act conspiracy, the rest follows pretty easily. And so I would say to the Court that because those two, you have a situation where two elements are missing, you really do have a structural error. If it's not structural, do you lose the point? I'm sorry? If it's not a structural error, do you lose the point? Your Honor, I think that the Alano case suggests that there may be categories where the Court might find an effect on substantial rights, and they don't really define it as being a category of structural error, and maybe there could be a species where you might want to presume prejudice, and it may be something like structural error, but not quite. I don't really know, but I think it's certainly a tougher case if it's not structural error. If you look at count one, we also have a much bigger problem, and that is count one is a conspiracy instruction without the conspiracy element. The defendants are charged with 371, but the judge starts out giving them the instructions on 2314, the substrate offense. Now, there's arguments in the briefs about whether the instructions as a whole are clear. The government points out correctly that the judge tried to correct it later. In fact, one time, it was a little ambiguous, and then after the argument ---- I think we've said the briefs, and you've used up more than you have. I'm sorry, Your Honor. Go ahead. Thank you. Is that Mr. Luckl next? Yes, Your Honor. Did I pronounce it correctly? Luckl, that's correct. How are you, sir? If I understand correctly, are you granting some additional time because that argument ---- Talk, and we'll let you know when you're done. I represent ---- I mean, try to stick to six minutes, but ---- I represent Zhong Nguyen, who's one of the crew members in this case. Which issue are you addressing? And I'm addressing the double jeopardy issue, which basically ---- Zhong Nguyen? D-V-U-N-G-Y-E-N. Okay. And the primary point that I'm making is that the Hobbs Act conspiracy charge is included in Count 1. And when it is duplicated in Count 2, that creates a double jeopardy problem. Now, Count 1 states that it is a conspiracy to transport stolen property in interstate commerce. So you start out saying, well, it charges a conspiracy under Section 371. However, it goes on to say that the conspiracy was carried out by means of robberies and burglaries. And I think everyone agrees that robberies and burglaries are not essential elements of the crime of interstate transportation of stolen property. And therefore, by making robberies and burglaries a part of the conspiracy charged in Count 1, what the government, I think, has done is charged the conspiracy in the traditional way. That is, under the Braverman case, the conspiracy is the crime no matter how diverse its objects. And so, in effect, what the government has done is charged in Count 1 a conspiracy with two objects, one, to transport stolen property in interstate commerce, and two, to commit Hobbs Act robbery. Then they duplicate it. Why is the government wrong at page 19 on its brief that one of the counts requires some evidence that the other doesn't require, and therefore, under Blockbuster, you lose? Well, the Blockbuster test simply does not apply in this case because they're not two separate statutes. There's not conduct charged under two separate statutes. There's conduct, in effect, charged under one statute. But do you agree separate issues are charged in the two counts? No. I think this is just, to simplify it a little bit, I think this is like charging a bank robbery in Count 1 and charging an identical bank robbery in Count 2. They're not two different statutes involved. Count 1 charges a dual object conspiracy, one object of which is Hobbs Act robbery. Count 2 then duplicates that exact Hobbs Act robbery. So we're not talking about two separate statutes, and therefore, the Blockbuster test has no application. So what I'm saying is simply by actually alleging Count 1 in such a way where interstate transportation, the stolen property, almost becomes incidental to the charge. Robberies and burglaries are such a large part of the charge in Count 1 that it practically takes over the entire count. What I'm saying by doing that is that they've done something that they didn't intend. They've charged both conspiracies in Count 1, and then they've gone ahead and charged one of those two conspiracies in Count 2. And the reason that's a reasonable construction, I think why that is best illustrated, is that the case against my client is entirely inadequate on the issue of did he conspire to transport property in interstate commerce. He was a crew member who committed the robbery up in Oregon. He had nothing to do with transporting the property in interstate commerce, and there was no evidence introduced in the case to indicate that he knew that the goods that he stole in the robbery were ever going to be transported. How much did he get paid? He got paid $50,000 for participating in a $9 million robbery. There's simply no evidence presented at the trial that he knew the goods were going to be transported in interstate commerce. As far as the evidence was concerned, the goods stolen in Oregon were going to stay in Oregon. There's no evidence from which the jury could infer that he knew about the interstate transportation of the stolen property. There was certainly evidence that some of the conspirators came to Oregon for the occasion. He, in fact, came to Oregon to commit the Oki robbery, but that's not to say that he had any knowledge what was going to happen to the stolen computer chips after his job was done. In fact, it was part of the conspiracy in this case to keep crew members like my client as much in the dark about the details of the conspiracy as possible. Isn't this the nature of conspiracy, that when you sign on to the conspiracy, you're pretty much tied to it? There are all sorts of things that conspiracy members don't know about. Once you get tied into conspiracy, you're responsible for other stuff that happens. They are saying, however, that count one charges a conspiracy that has nothing to do with Hobbs Act robbery. They're saying that it's only a conspiracy to transport stolen property in interstate commerce. That's what they say the charge is. I'm saying it was more than that, and then they duplicate that charge in the second count. But there's simply no evidence that he ever participated in the interstate transportation of stolen property part of the conspiracy, or even that there is a reasonable basis to infer that he had knowledge of the fact that the goods were going to be transported. I imagine my time's up. I'm happy to continue to answer questions. Let's have questions from the next chair. Mr. Johns, you're up next. I'm Christopher Johns, Your Honor, and I represent Longhoi San, and I'll be addressing the prosecutorial vouching issue. This is a case that was built on the testimony of cooperating witnesses. The cooperating witnesses' testimony, that's the glue that holds the government's case together. Without those cooperating witnesses, their case falls like a house of cards, and that's why the vouching was important. There was vouching in a number of aspects. It's pretty good glue, though. Excuse me, Your Honor? It's pretty good glue. When they have these witnesses, yes, Your Honor, and that's why their credibility was at issue, and that's why it's important. I mean, in the closing argument, when the prosecutor stands up and says, you can call these cooperating witnesses whatever you want, those feel past criminals right down the line, and then says, but these are individuals, and these are witnesses that the government put up in their case, clearly what's going on here is the government is vouching for these witnesses, is using the government prestige to bolster these witnesses, and that's improper. Well, if it didn't do that much, the prosecutor didn't say, oh, I believe the witnesses, and therefore you ought to believe them. He didn't say, these are the greatest witnesses, the government's ever put on in a case, or anything like that. It's the mildest form of vouching, if it is vouching at all. I don't think it was, Your Honor, because I think when they go on further, and we put it in the context of the entire closing argument, they state, if Tractran were the organizer in this case, you'd have to believe that he framed every single one of these defendants in this case, and that the government was involved in that knowingly, and that the government was complicit in that kind of thing, and that we were so desperate, we willingly pinned this down on eight innocent men, all because we wanted to buddy up to Tractran. Well, Tractran was one of their primary cooperating witnesses. Obviously, they're putting the government stamp of approval on this witness. That's improper. That's clearly vouching. Well, clearly vouching isn't enough. Unfortunately, counsel didn't see it as clearly as you see it now. Absolutely no objections. That's true, Your Honor. So it's real plain air. And that's why we have the plain air standard, and that's why this Court has ruled on several occasions that if the vouching rises to the level where it creates a fundamentally unfair trial. Well, the issue of the vouching was so good it mesmerized even the defense counsel. There wasn't an objection, Your Honor. There's nothing that I can do about that in hindsight other than point to the record and note that there clearly was vouching going on here. But it's not just in the closing argument. I'm not sure the last thing you said was vouching. Obviously, the defendants are trying to say that the clients were framed, and the government is saying, well, if you have to believe that, you have to believe that the government, along with these testifying witnesses, went to trouble framing the defendants. Is that very vouching? Your Honor, this isn't a situation where these comments here where they repeatedly refer to the government and put it in a context where they're standing up for these witnesses. This isn't a reasonable inference from the evidence. I mean, there was some argument that was a reasonable inference based on the evidence. But when the government keeps saying these are government witnesses, and, in effect, the government is standing behind these witnesses, that's classic vouching. That's putting the prestige of the government behind these witnesses. That's what was going on here in this closing argument. And that's even seen further when they have the testimony of Sergeant Miller. The prosecutor gets up. He starts talking about Sergeant Miller having a discussion with Thak Tran. I mean, the government, in fact, puts its prestige behind the witness every time it puts a witness on the stand. I thought the big deal about vouching was that the prosecutor was saying to the jury, you know, you really ought to believe these witnesses because I know stuff that you don't know and you didn't get a chance to hear. They don't say it explicitly, but that's the message. That you really, let me tell you, I have superior information here, and you ought to really believe these witnesses for reasons you weren't told about. Nothing like that happened here. Well, it did happen with Sergeant Miller. With Sergeant Miller, they're referring to evidence outside the record, a discussion, a debriefing that took place and that the prosecutor attests to. We go back and we look at Sergeant Miller's testimony. He never testified to that. So clearly in this argument, they did refer to an instance outside the record, dealing with a very important witness, and they tried to bolster him by using Sergeant Miller's testimony, and he never testified to that. Not under that instance, but, again, there was no objection to that. That's correct, Your Honor. This is all a plain error review. And that's the kind of sort of express statement that if there had been an objection, it could have been cured by an instruction. The juror had been told to disregard it, and, of course, it does fall under the general rule that lawyer's statements are not evidence, but the proof is troubling. But it's a little surprising that this wasn't caught. Well, Your Honor, just to make a couple of comments, the government's response, they say that there was a curative instruction, but there really wasn't a curative instruction for this vouching. There were general instructions. Pattern after the model instructions, this Court has promulgated 410, 411, and 412, but there was no curative instruction for this conduct. And they also say that this conduct was invited, but it's well settled in the circuit that United States v. Kerr that, you know, attacks on the credibility of a defense witness, they're legitimate tools of advocacy. That didn't invite this type of conduct. If the defense counsel brings it out in cross-examination, then there's no problem. Correct, Your Honor. Okay, thank you. We'll hear from Mr. Searles next. I think that's who's next, right? Good morning, Your Honor. It's Donald Searles on behalf of Kwok Nguyen. I've raised in my brief two arguments, one of which is unique to him and the one that I would like to address my attention to during the course of my argument, given the amount of time that I have, and that is the evidence of third-party culpability and what was the Court's ruling depriving the defendant of his ability to present that evidence. Keep your voice up, please. Thank you. With respect to the first argument that I have regarding this deficiency of evidence on count one and whether Kwok Nguyen, a simple crew member, was involved in the overall three- or five-year conspiracy, unless the Court has any questions, I'll simply submit it on the briefs. With respect to the evidence of third-party culpability, the government articulated a standard to the district court, which has since been repudiated and expressly overruled by the California Supreme Court and has never been the law of this circuit. The standard that the government advanced was that it is a rule of exclusion. Unless the defendant is able to present evidence of substantial evidence connecting the defendant, excuse me, connecting the third party to the commission of the actual crime, then the evidence should be excluded. What was the evidence here again? The evidence here, the evidence regarding my client. His brother was the one, right? The evidence was that the defendant's brother, Kwok Nguyen, also sharing the same first initial, obviously, of Q, was involved in... Right. He took the identity and checked in the motel as Q Nguyen, right? Yes. So he... The evidence was more than simply that he had a brother with the same first initial. His brother, Kwok Nguyen, was involved in what we colloquially call in the briefs of the Highway 101 robbery, which was a sting operation conducted by the police that occurred six weeks after the Oki robbery. Not only does the defendant share the same first initial, but he also shares the same association with the same co-conspirators as in this case. There are two principal co-conspirators in the same crime, in the two crimes. One was Nantran, and the other was the government's principal witness, Traktran. They both involved the theft of millions of dollars of computer chips. They both involved the use of walkie-talkies. What exactly did he seek to admit that wasn't admitted? Was it testimony? Why was it? Well, what the government, what the district court, in trying to sort of deride some justice here, allowed the defendant to present some evidence of his brother's, what I would submit, simple criminal propensity. That's not what I asked. What I asked is, what did the government, what did the district court exclude? The district court excluded the fact that the brother had been involved in this other crime six weeks later involving many of the same co-conspirators and the same type of offense. You indicate there's a California Supreme Court decision, which of course doesn't bind us, but isn't the situation one where there's actually two tests in the circuit and we haven't cleared up one of them, whether substantial evidence is required? And Judge Ware chose to follow that line of cases, and your argument is that he can't do that. That was an abuse of discretion to follow that line of cases? Absolutely. This court held in Morales that if a district court judge uses an erroneous view of the law in determining an evidentiary standard, then it necessarily is an abuse of discretion. I understand that, but here we've got two lines of cases in our circuit. How can you say one is right and one is wrong when we haven't told you which is which? Well, one I think is clearly wrong. Well, I think you think that. Well, let me explain the basis for my thinking in that the case that the government relied on, the California Supreme Court case, is derived from this called Mendez-Arline rule of cases that was most recently expressed in People v. Green before it was overruled in People v. Hall. Now this court, the first time it addressed the Mendez-Arline rule of cases was in Perry v. Rush, and it states in its opinion that the Mendez-Arline rule is not a common rule of evidentiary law but seems peculiar to California. The court goes on to say it has been criticized by California judges. Like the district judge, we do not doubt that in some situations application of the Mendez-Arline rule would violate the Constitution. So when it was first noticed by the Ninth Circuit, it was viewed as an evidentiary rule of law that is unique to California and that has potential constitutional implications by creating an undue burden on a defendant's ability to present exculpatory evidence. Now unfortunately it turns into sort of a game of telephone where over a series of cases and a series of string sites and a series of blind recitations to Perry v. Rush, we now have these other cases, People v. Ignacio and Walters v. McCormick, which now announce that this California unique evidentiary rule of law is now Ninth Circuit law. It was never recognized as such, and this, at a minimum, I think this court, regardless of whether it finds whether this is harmless in this case, should cut the root, excise this, because it does place an unconstitutional burden. I understand your argument that you realize, of course, that we can't overrule prior panel decisions. You have to petition for a rehearing in bank for that. But what we have is what we have, and what we have are cases in our circuit that our circuit has decided wrong, you point out, but if a district court follows our decisions, how can we overrule them on an evidentiary point? The evidentiary standard is clearly set forth simply in Rule 401. Any evidence that has any tendency to make more probable than not any material point in the case should be admitted. You're telling us that those decisions were wrong, and I'm not even asking you about that. As long as they're there, and we haven't overturned them by an in-bank decision, how is the district judge reversible on an evidentiary point when he follows our decisions? Well, if one reads these three cases that I cite... It's like we get reversed when we follow the Supreme Court's decisions. No, but the government could have done the same thing that I have done on behalf of my client. And go back to the root of these doctrines, and find that it has been overruled by the Supreme Court, and that Perry v. Rush, the first case addressing this Mendez-Arline rule, recognized it as a unique California evidentiary standard. Okay, the government could have done that, but that doesn't obviate the problem I see with the case. And there may be a simple solution, but I'm having difficulty. Let's assume you're right, that this is a bad rule or wrong rule. Still, it is the rule that hasn't been overturned and is binding on the district court. Now, if the district court follows a wrong rule, can we reverse the district court on an evidentiary issue? As long as it's our rule, right or wrong? Well, there are other standards by which we can judge the admissibility of this evidence. Other cases that are not restricted solely to McCormick and Ignacio. Let me make sure I understand what this evidence is about, and this does tie into this point. Normally prior bad acts evidence doesn't get admitted. Specific prior bad acts evidence doesn't get admitted. You don't admit evidence that somebody was a bank robber in a park, committed a prior bank robbery or some other crime, whatever the crime is, to prove that he is more likely to have done it in this case. Why wasn't this just regular old prior bad acts evidence, not vis-a-vis the defendant, but vis-a-vis the brother? What you're really saying is, it must not have been you, I mean, your client. The argument would be, it must not have been me, Clark, who was there. It must have been my brother, and the proof that it must have been my brother is, look, he's the kind of guy who did this thing before, and therefore he's likely to be the one who did it again. That, in fact, was all that my client was left with, being able to argue at the district court level, at trial. It was a vague criminal propensity. That's not normally an influence of McCormick's withdrawal. No, no, and I think the suggestion that what happened below is harmless because my client was allowed to argue from a half a deck of cards the point that his brother had some vague criminal propensity really does a tremendous disservice to what actually happened below. Rule 404 is not a rule of exclusion of other prior crimes act evidence. It is a rule of inclusion, and there is a presumption that such evidence is admissible unless all it shows is criminal propensity. Now, I set forth in the brief that this standard of admissibility under 404 is the same whether it be the government or whether it be the defendant who is trying to admit this evidence. So what was the proof that he had been involved in this prior robbery? The proof was... The proof that he was involved in this prior robbery, how did it bear on your client's defense other than by showing propensity, showing that the brother, having done it once before, is more likely to have done it again? I think the evidence shows far more than a simple propensity. It shows an association with the brother and two of the principal co-conspirators in this case. It's more than just somebody robbed the same bank last week. It's doing it with the same individuals closely in time, separated by only six weeks. The brother and my client shared the same address. They had similar physical appearance. The principal witnesses against my client, two cooperating co-defendants who fled out and cooperated with the government, neither of them recruited my client, who was at most a crew member in this case. Both of them had a difficult time recalling his presence, my client's presence, at any of the events leading up to the robbery. At the robbery, my client, according to the government, is wearing a stocking mask and cannot be identified. I set forth the quotations in the transcript in my brief. Troctron, for example, one of the two witnesses identifying my client. If I understand your answer to Governor Chase, it is not just a robbery. It is actual association with the same group of people. Absolutely. And the government repeatedly points to the critical evidence of Nontron, one of the co-defendants' principal organizers, repeated phone calls to my client's pager. And they continually refer to it in their brief as Quacknoyan's pager. In fact, all it is is the pager of the individual who registered at the travel lodge under the name of Quacknoyan. Those series of telephone calls, I've set forth both in my brief and in the reply brief, the schedule of those so-called critical telephone calls. And what those telephone calls show is a series beginning on October 26 prior to the Oki robbery and continuing steadily past the Oki robbery up to December 16th, the day before the Highway 101 robbery. So that they terminate upon the arrest of Quacknoyan. Had the jury been able to view that critical telephone evidence with the fact that Quacknoyan had been arrested on December 17th and associated with the same individuals, it's quite possible a different verdict would have been rendered. Judge Kuczynski, you stated in Crosby, in terms of this potentially other line of cases that we can draw on, is that if evidence that someone else committed the crime is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative or fantastic. I don't think so. We'll carry the cases. Thank you. Thank you very much, Your Honor. Okay. We'll next hear from Mr. Geronimo. Yes. Good morning. Representing defendant Ngo. Correct, Your Honor. Thank you. How are you? Fine. Thank you, Your Honor. Your Honor, I just wanted to briefly highlight one point that is particular and specific to Mr. Ngo, and that is this Thai Van Do home invasion rape or sexual assault robbery that took place. Your Honor just mentioned, Judge Kuczynski, that normally this kind of evidence is not admitted just to show propensity. Here it seems to be sprung out of nowhere. The judge himself was troubled, particularly the second time it came up, saying that it was based on mere suspicion. What is – I'm sorry. I missed the issue. What's the issue you're arguing? The issue is that the district court should have granted the mistrial when it was asked for twice. The mistrial issue. Okay. When the prosecutor brought in the suspicions that Thai Van Do's family, the co-defendant who was acquitted, their suspicions that they blamed my client, Mr. Trai Duc Ngo, for this home invasion robbery. It's completely unrelated to the Okie robbery. If her intention was to try to show a prior relationship between the two co-defendants, she could have given notice of this, and the judge could have limited it to simply questions about whether there had been a prior automobile transaction. That was not done. There was a request, a motion for disclosure of other crimes evidence that my client joined in pretrial. This came out of nowhere, and then I submit the prosecutor, when initially told by the judge not to do it, did an end around and got it in by harping repeatedly over their suspicions that this car was related to the home invasion robbery. She did it on cross-examination. A black BMW issue. And she also brought it in a rebuttal. I think my brief lays it out. I think it was highly prejudicial, particularly when you consider that Thai Van Do were the evidence by the two complainants. Now, the jury was admonished, and the prosecutor did most of that. But not the end around. They were given courage of instruction the first time, but the judge... Excuse me. I didn't hear. Not what? Yes. The judge initially told the jury to do... I didn't hear the word you said. I'm sorry. I forgot which one I didn't... The end around. I didn't understand the word. My point is, your Honor, yes, the judge did give instructions in the beginning. Gave instructions on the spot. On the spot. Okay. But then the judge did... Then the prosecutor brought in the end around about tying their suspicions that the BMW was the cause of this home invasion robbery. And those things that this judge admitted... Admitted and allowed. Over-objection. Over-objection allowed, and it even allowed the rebuttal, and I think that was highly prejudicial. And did the judge handle this by instructing the jury? He gave on-the-spot instructions the first time it happened, but apparently he... Instruction was what? To disregard that evidence. The jury is not to speculate... Exactly. ...as to whether or not your client was actually a participant in the home robbery. That's right. Pretty good instruction. But he allowed the jury to hear further evidence that it seems to me it could accomplish the same thing. Yes. But we couldn't say... But the jury, he doesn't have to repeat that jury instruction again. No, but I don't think he should have allowed the evidence to come in again afterwards. Okay, but you're going for a mistrial now. You have to show abuse of discretion when the judge gave a curative instruction. I admit he gave them initially, but I don't think he gave them after it happened again, and the repeated bringing in of the evidence should have triggered the mistrial, and I do submit that his failure to do so was an abuse of discretion. How many times did you move for a mistrial on this issue? Twice. Well, counsel below did. Two times, and both were denied. If there are no further questions, Your Honor, I'll submit it on that. Okay, thank you. We'll hear from the government. May it please the Court, I'm Kirby Heller, and I represent the government. I'll take the issues in order that they were argued in front of this Court. As first as to the Hobbs Act instructions, the government submits, excuse me, that there were no errors at all.  As Justice Kaczynski pointed out, and to the Overt Act supposed error, we, of course, don't believe that it's any error at all. The reasoning that the Supreme Court has articulated in Treboni, there's no Overt Act requirement in the Hobbs Act. The majority of the courts of appeals have held that, and a plain reading of the statute would compel the finding that there is no Overt Act requirement, but even if there were, it couldn't possibly be plain in light of all those circumstances. Nor is an Overt Act required to make the statute constitutional. Again, in Treboni, 846 was a conspiracy without an Overt Act, and there are no problems with the constitutionality. There's nothing, excuse me, about an Overt Act that would be needed to bring it under the requisite federal jurisdiction. This court has said in the context of conspiracy to commit a Hobbs Act robbery that there doesn't have to be an actual effect. It's merely that if the scheme were realized, would it have a probable or potential effect, and that test can be applied whether there's an Overt Act or whether there isn't an Overt Act, and it's analogous to, for example, a government sting where there never is an actual effect on commerce, but this court has said that if the scheme were what the defendants thought it would be, that's sufficient. The other thing I just want to point out in terms of this particular robbery is that it's a robbery of a business, and to the extent that the cases that the defendants rely on in their brief, like Lynch, are robberies of individuals, that's a very different matter. And there really was abundant evidence on an actual effect on commerce in this case, and the effect that the robbery of this Oakey Semiconductor would have on commerce. Next, as to the double jeopardy point. Oops. Don't leave count one. There's a challenge in the briefs that there is a failure in count one because conspiracy was never defined, and so count one went to the jury without a definition of conspiracy and therefore is infected and has to be reversed. Your Honor, as to count one, it was our position, and laid out in our brief, that when you look at all the instructions in the record as a whole, as one must do under a plain error standard, that the jury knew that count one charged a conspiracy and what a conspiracy means. And you're referring now to the jury instructions given for defining conspiracy in count two. Why does that make it worse? Well, I'm relying on several things. Admittedly, the court made an error. I mean, there's no doubt about the error in count one, right? In its oral instructions, it said, I'm going to read you the law of conspiracy as it applies to, and it sort of hesitated. It was obviously a little confusing. There's no definition of conspiracy in count one, was there? In the written instructions, which were given to the jury, the court got it right. Well, that is my question. My question is, in count one, did the judge properly instruct on the definition of conspiracy? In the oral instructions, Your Honor, although... The instructions they got. The oral instructions, the court did not say. It laid out conspiracy law, but it said it applied to count two. Okay. And then, yes, it laid... The answer is no, he did not give the appropriate definition in count one. That's your first answer? Initially, yes. All right. And then your answer is that it's saved because it was done in count two. Not exactly, Your Honor. We believe it's saved because of all the other indications in the record that the jury was instructed that count one was a conspiracy count. Do you agree that there were instructions of the definition in count two? There were definitions of conspiracy, and initially the court said these apply only to count two. Well, you keep saying initially. The court says, I will discuss briefly with you the law relating to that should be read just count two, the conspiracy. That's correct. Now, that restricted all of the definition of conspiracy under count two to count two. Now, isn't that fairly clear what he said? Well, I believe, Your Honor, again, when you look at the rest of his instructions as well as the way the case was presented to the jury... Let's take it one step at a time because I'm interested in the same issue that Judge Wallace is. Aside from the instructions given in count two, what instruction told the jury that they should apply, that you think, instructed them as to conspiracy on count one? The written instructions. Right. Okay. Oral instructions. Okay. I'm sorry. All right. You know what I'm asking, so... Okay. In the supplemental instructions that were given after, before the jury deliberated but after the summations, the court then said clearly the defendants are charged in a conspiracy in count one and count two. Count one, I'm not citing it verbatim, but count one is a conspiracy to transport stolen property in interstate commerce. That means an agreement, a conspiracy to agree to do this, so it highlighted that count one was a conspiracy. At the end of, at the end of the, so I guess that was when it was discussing Pinkerton. So he said the conspiracy count was a conspiracy count. What else? And he said agreement. He gave a response to a jury note that, again, count one was a conspiracy to transport stolen property and also discussed the overt act requirement as to count one. Where did he say that the conspiracy, where did he define conspiracy in count one? The, he didn't, in the supplemental instruction he didn't give the elaborate couple of page description of the elements of conspiracy, but he did say it was, that it is an agreement and that is, I believe, on, in the, in our excerpt of record on page 315. 315. Let me double check and make sure that that's right. Yes. He says, the court says, starts talking about Pinkerton. It says under the law, as stated in the Pinkerton case, a conspiracy is a kind of criminal partnership. And then he says, in this case, the crime is the agreement to transport stolen property of a particular value in interstate commerce. And the agreement to obstruct interstate commerce by robbery. So he refers to the fact that count one is a conspiracy count that has to do with conspiracy. And that's as close as we get. Is that correct? In the oral instructions, yes. Okay. In any instructions, is that as close as we get? You don't seem to be helping me too much with your answers. Could you be a little more specific? I'm trying, yes. I'm trying to find out what happened here, and you're as an officer of the court are supposed to help me. I'll do my best, Your Honor. In the instructions that he orally gave to the jury, that the supplemental instruction most clearly presents to the jury that count one is also a conspiracy. And that's at excerpt 315. Yes, Your Honor. Now, as I said, and perhaps this is going in. Are you arguing that it was cured by the instructions? Well, it's not. Yes, I believe it is, Your Honor, because the standard is to look at the record as a whole. And when you look at the record as a whole, in addition to the court finally stating to the jury that count one is a conspiracy, the written instructions lay it out clearly that its long description of the conspiracy element applies to count one and to count two. I take it the court here did what is normally done, which is to submit instructions before giving them. Passed by counsel and objections, and everybody agreed on what the instructions would be before the instructions were actually given. Yes, Your Honor.  Normally, in my experience, counsel follow along word for word. Right. Which brings me to another point, Your Honor. To the extent that there was no objection to what the court first said, it seems to me that that indicates that this was a misstatement on the part of the court and not that noticeable because no one objected and said conspiracy applies to count one and count two, that this was a misstatement by the court and no one really picked up on it. And in light of all the repeated references to the fact that count one charged a conspiracy, it's fair to therefore conclude that the jury was not misled about that. Well, the problem, I think, there's the generic overarching problem with count one, but particularly as to the two crew members, Ngo and Quoc Nguyen, you don't have, there's not much of a distinction between the conspiracies on count one and two, and that's not the way it was argued. Argued as any, this is a conspiracy. If you do one thing, you're guilty of everything. And I don't understand, in looking at the closing argument, the way it was argued, I don't see any difference in the argument as to count one and count two, although they're dramatically different conspiracies. So that compounds the problem with the instructions, because the instructions omit the element of agreement on count one, and it was argued if you agree to anything, you're guilty of conspiracy. And so let me follow up and see if you can answer the whole. Then if there is a difference, I mean, if you're saying, well, it doesn't matter, then you do get into a double jeopardy problem. So tell me how it all makes sense, and it's not plain error as to at least those two crew members. Well, Your Honor, first as to the difference, just one point on the error in the instruction. The error, if anything, was that the court instructed on the substantive offense and not on the conspiracy offense, which is a slightly different issue, or a very different issue, really, than the overlap between count one and count two. And so one final point on the instructional error is that under a plain error standard, it's really unlikely to have any effect on the verdict in that any jury that convicted on the substantive count really would have had to have found that there was an agreement as well. Now, as to count one and count two, first of all, as to the crew members who, the two individuals who were crew members and not organizers, the government doesn't have to prove that they knew that these goods were going across state lines. Certainly they knew that these goods were being transported. There was a truck that came up from California. They were loading. They robbed Oki. But my point is, not sufficiency necessarily, but the fact that the omission of the description of the elements of the crime on count one and the way the case was argued to the jury might have led the jury to believe that you could convict them on the basis of the same evidence on count one and count two. Well, Your Honor, I... And, well, I mean, it certainly prejudiced the argument on count one, the failure to give the material elements of the crime, particularly as to those crew members. But the mistake, if any, in the charge didn't really go to the relationship of the Hobbs Act robbery to the Interstate Transportation Act. I'm jumping ahead and making... But I think it goes to the prejudice of the issue, not necessarily a legal argument on the first one. Well, Your Honor, the two counts are certainly related, and one reason, of course, that they were included, any mention of the robberies, of course, was included in the count one conspiracy in the indictment and then argued to the jury was that the main intent element that you have to prove or knowledge element you have to prove as to count one is knowledge that these chips were stolen. So certainly that information was relevant both in the indictment and was part of the government summation. And when you look at the government summation, there are really two parts to it. One part, the prosecutor is telling the story and trying to tie it all together. But there's another part where she's trying to talk about the legal elements of the crimes. And there she carefully differentiates the two crimes. And once she says, here's the count one conspiracy, and this is what we have to show, an agreement to transport the stolen property, then there's count two. But certainly some of the facts will go to both, and the fact that she mentioned the fact as to both merely shows that there's an overlap, but that doesn't create necessarily a double jeopardy problem unless you apply Blochberger and find that it does. Regardless of how extensive the defendant's involvement was in the conspiracy, whether it's been with others more or less under the law and members of the jury, each defendant's equally guilty. I mean, that's the argument, and that's the argument as to the crew members. So you're importing the argument, the Hobbs Act violation conspiracy, into count one. Now, the problem, I guess what I'm driving at is the problem is that when you misinstruct on count one, then it compounds the confusion that the jury may have had that there was a line blurring between count one and two. And, you know, count one is a very more serious count of conspiracy. Well, count one is the longer conspiracy. Overall, it's been five years. But my point, Your Honor, is that those are really two separate issues, and the court's instructional error I don't believe would implicate the relationship between count one and count two. It merely is some error between whether count one is the substantive offense, which would be harder to prove, or the conspiracy, which we submit would be a little easier to prove because you don't have to prove the completed act. Take your point. I want to go back, Ted, please. I have pulled out the excerpt, page 315, that you believe takes care of the problem of the count one not fully instructing on definition. It appears the district judge was concerned because attorneys were using the term Pinkerton charge, and he had not used that. And he clarified his instructions. And he did say that a conspiracy is kind of a criminal partnership. And I take it when he uses kind of a criminal partnership, it's the position of the government that that is an agreement to accomplish an illegal objective. And I understand that argument. But in United States v. Romero, we had a second issue that must be defined, and that is the intent to commit the underlying offense. There's nothing on page 315 that gives that part of the required instruction. Where is that instruction, part of the instruction's definition saved? You're correct, Your Honor, that he doesn't go through the detailed conspiracy instruction in the supplemental charge. Our argument is that it's important for the jury to understand the count one charge of conspiracy. Once that is sufficiently charged to the jury, and page 315 is one place where there it is, the jury... There's more than one page? When the court first instructs the jury on count one, it says it's a conspiracy. Okay. But the important point is once the jury understands that count one does charge a conspiracy, then it would know that the court's longer, several-page instructions on conspiracy law apply to count one as well as count two. That's the part of the instructions where he specifically has said they apply to count two. Right, and we're arguing it's saved by the written instructions as well as the further discussion that count one is a conspiracy. Well, now there's no objection to these instructions, as I recall. None at all, Your Honor. So they're clearly erroneous. I mean, they are erroneous. The intent was never instructed on count one. What you're saying is that it's not clear error because they would have now understood that they were to take the intent instructions, intent to commit the underlying offense, from count two and put it in count one, although he instructed originally it was to apply only to count two. Yes, Your Honor. Okay. Well, I see your argument. May I ask you about vouching? Excuse me? May I direct your attention to vouching for a minute? Certainly. Would you explain, and perhaps you can clarify this. I have two concerns on the vouching. One is the statement in closing, when I debriefed Nam Pham, I'm probably mispronouncing it, he had no idea that he had done a smart module robbery. The prosecutor is saying, when I debriefed him. Where did that come into evidence? That, I believe, was the Sergeant Miller. So it didn't come into evidence. Right. So basically, and I just want to clarify the record here and the significance of that. I may or may not fall. So that statement at least refers to some discussions with the prosecutor and the cooperating witness outside the record and was used to try to bolster the credibility of the witness. Correct? Yes, Your Honor. Okay. The second one I'm concerned with is the statement in rebuttal that says, and we told the court, didn't we, that we would look at the testimony fairly and without prejudice and we would decide for ourselves, without regard to what names they were called or what agreements they had, that we would decide their testimony and we would evaluate it as we saw fit. What does that mean? I have pulled out the larger context from which that came because when you just read that one section, the we sounds like it's talking about the prosecutor. But I would submit when you look at the entire context of those comments, that the prosecutor, when she says we, is actually referring to the jury and it's just perhaps a slip on her part, but she doesn't mean we, the prosecutors. Here's my question. Did the plea agreements in this case call for an evaluation of the truthfulness of the testimony as a condition for sentence? Yes. So I guess an inference could be drawn from that, that we would decide for ourselves what their testimony, we would decide their testimony and we would evaluate it as we saw fit, at least as susceptible to the implication, that the prosecutors, if they thought the witness was lying, perjury, that they would remove the benefits of the plea agreement. Right? And can you again direct my attention to which portion of her argument I'm referring to? I'm talking on page, the transcript, page 110. I think it's excerpts 425. The concern in Redberg and other cases is that if you put a plea agreement in front of the jury that basically says the court or the prosecutor, we have guarantees of truthfulness because we have a lever on these people that we're going to pull. And if we don't think they're truthful, you know that we're going to do something about it. That apparently was a feature of the plea agreements in this case. And the question I have for you is isn't it a fair implication of the statement that we would look at their testimony fairly and without prejudice, we would decide for ourselves without regard to what names they were called or what agreements they had necessarily, we would decide their testimony and we would evaluate it as we saw fit. So my question to you is that it lends itself. I understand your interpretation that we're talking about the jury. That's hard for me to draw, but I accept that. It doesn't lend itself to the implication that the prosecutor will be evaluating the testimony as to truthfulness and will take punitive measures if the cooperating witness is not truthful. I interpreted that part of the summation, Your Honor, as when she says we, she didn't really mean we the prosecutors, but she actually did mean the jury. And when you look at the statement right before that, she says you have to consider their testimony, the cooperators. That's the oath you took. That's what you told the court you would do. You knew that individuals were coming into this case to complete agreements with the government. We all knew that. And we told the court, didn't we? And I read that comment as... Well, we can't refer to the jury when it says we told the court. Right? Well, again, maybe that's ambiguous, but I think that was a linguistic flip. And now she's putting herself maybe improperly to say what the jury... You have a right to answer my question about you. And as to the other statement, it is true that she referred to the fact that wasn't the record. I believe, again, looking at it in context, it certainly wasn't intentional. It was a mistake. And that she said that statement in the context of many other statements about why the jury should believe NAM, FAM. One question that you can help me with. I just don't recall the law. When the government witnesses are attacked as to credibility, then you can bring out the agreements that they agreed to testify honestly. In this case, I understand that this was done in direct examination of the witnesses based upon statements made in opening statement by counsel. Have we got a case that that triggers the opportunity of providing the agreements? Yes, Your Honor. I don't remember the names of the cases off the top of my head, but they are in our briefs that if the credibility of the witnesses are attacked in opening statements, the government can bring it out. That's sufficient. You can do it indirectly. Didn't Rudberg say exactly the opposite, though? Rudberg involved a situation where the credibility was brought out by the defense counsel in the opening statements, and we still found plain error, right? Your Honor, I don't recall the details of that case. I don't remember, first of all, if it was a plain error case. Yes, it was. I don't recall the facts, but I can certainly look at that and distinguish it for the Court if you would like me to. Let me turn, if there are other questions on these points, to the point, Kwok's point about, and forgive me for referring to them by their first name, but I've avoided confusion, about the Court's failure to admit the evidence about his brother's involvement in the Highway 101 robbery. First of all, although the Court did articulate that it was applying the standard of the substantial evidence, which had been in this Court's cases, it was clear from his analysis that he really was doing a 404B kind of analysis, because in the final analysis of the question, he determined that the crimes weren't sufficiently similar in a distinctive way to warrant an inference of identity as required under 404B. This Court has specifically stated that to bring in testimony either side, under 404B, on a sort of signature crime issue, there have to be some distinctive similarities. And that's what the Court looked at and decided that they weren't sufficiently distinctive to warrant that inference. And if one can't make that inference, then it does come down to a propensity argument, which, of course, is prohibited. If you look at the similarities between the crimes, they really are very generic kinds of things. There's duct tape, there's walkie-talkies, there's guns. As to the differences, which are... They're the same participants, aren't they? They're the same participants. Well, some of the same participants, and that's... Why would you list the similarities and leave something like that out? Well, I was going to make that as my next point. Why would you sort of draw attention to it? I had that in my thinking as a separate category, but let me bring it out right now. Why is it a separate category? You were going to list to us all the similarities of merit, and you leave out the one thing, right? Why would you do that? You think that gives you credibility? You think that helps your case? Well, I certainly didn't mean to, Your Honor. I was certainly, as I said, I was going to... Did you think we weren't going to notice? Let me just bring it up right now. As to the relationship between Nahn and Fastron, the cooperator, they played a role. They were the organizers, or Nahn was an organizer in the Oki robbery. He recruited the crew members. He was involved in paying off the crew members. His involvement in the Highway 101 robbery, according to the Crockers, was quite different. He was not involved in the robbery. He didn't want to be involved in the robbery because he was probably too busy working on the Oki, and his role was limited to getting rid of the stolen property. That's your theory. I mean, isn't it powerful evidence, though, to say, look, my brother's a criminal. He was doing all this stuff. I wasn't doing it. And, in fact, he knew these people and committed a crime within six weeks before. I mean, that's fairly powerful evidence. It's much different than propensity evidence as opposed to saying, you know, my brother's a criminal and, therefore, he could do this. I mean, that doesn't do much for me, but to say he was part of the conspiracy, which I gather you think he was because he was involved in the Southern robbery, is quite a different matter. Explain to me why you don't think that's highly probative. Well, I guess I think it's not highly probative of identity, which is the issue in the case. The case is whether it's a mistake in identity. So to say that the brother was involved in a separate robbery, with some differences that I can't get into, with some of the same people who play a very different role, I don't believe that that necessarily leads to an inference that he was involved in Oki. And, in fact, It's certainly a possible inference. It doesn't necessarily, it's not a required inference, but it's a possible inference. I think it's a quite weak inference in light of the facts in this case, Your Honor, given But it's a possible inference. And then we have to look at what the evidence you presented differentiated in your case in chief. You have the notation in the motel as Q, the initial Q. You have a witness who identifies him only vaguely with a mask. And there's almost no evidence, if any at all, identifying him as being present at any of the sessions. Is there any point where you actually nailed down and identified him as the one? Well, I think the identifications of the two cooperators were quite strong. There was no hesitation that it was Kwok who was there in the Highway 101 robbery. And, in fact, there was some specific point that both of them remembered, is that because he was one of the taller of the crew members, his job, along with another. One of the defendants who did get off mistaking identity despite all of that. There was another defendant who did, Your Honor, who had a very different and stronger. Did the cooperating with the Shazam file that defendant, too? I believe not as strongly. Sach Tran, one of the main cooperators, had problems identifying that defendant from the photo spreads that were first given to him. And there was no question to Kwok that there was any difficulty in identification. And both cooperators knew him. One went to school with him, and the other one testified that he had known him for about a year. So from the government's witnesses, there was no hesitation in the identification. So why did the government resist with such a strong hand? Why did the government resist this weak evidence coming in? Your Honor, one big complication about this evidence, besides the fact that the government thought that the inference was weak by itself, is that the motion was brought up at the close of the government's case, along with a motion for a severance. Because, of course, if this evidence came in, it was going to implicate none, and there were real concerns about none. And the district court was very concerned about that aspect of the evidence, that it was brought up so late in the case with a motion to severance, and was concerned about that aspect of it. I see my time is up. Was there any direct evidence that the brother was involved in the Oki robbery, the actual commission of the Oki robbery? No evidence whatsoever of that, Your Honor. In fact, it came out during the cross-examination, actually the direct, I should say, of the government, of the FBI agent, Agent Hinkle, that no one identified the brother as being involved. And they had shown his picture to the cooperators, and no one identified him as being involved in the Oki robbery. Okay. Thank you. What do you say about the black BMW evidence? The district court was quite troubled about bringing in the evidence of this personal motive, of the robbery, and yet counsel, what was the point of pursuing the black BMW evidence, given the district court's admonition? Well, the government, the district court, of course, said, I want no evidence, nothing linking Mr. No to the home invasion. And after it sustained the defense's objection to that point, no evidence came in on that. And, in fact, the district court complimented the government about staying within the confines, it had said. The government was allowed to bring in evidence about the black BMW for really two reasons. One was to show that there was some association between Ty Van Do and No. That was important to show that they were both co-conspirators. But more specifically, Ty Van Do had stated in his opening and then testified. How did the black BMW tie them together? Ty Van Do had stated at one point to a police officer that he had purchased the black BMW, well, that the black BMW had been given to Ty Van Do's mother as collateral for some loan sharking, in some loan sharking deal, and then the mother had given it to Ty Van Do, and then No had taken it back. But the testimony that came out about that simply was, did Ty Van Do buy it from No? And he had denied that on the stand. And so the government introduced evidence that contradicted that denial. The evidence... I'm trying to understand. What difference does that make for purposes of your case? Two, Your Honor. One is to show an association between these two defendants. And the other was to directly contradict or to impeach Ty Van Do, who had testified that he didn't know any of the defendants. And this tended to show that he did, in fact, know Mr. No. So they have this deal about the BMW. That's correct. And what about the evidence that the BMW was involved in the robbery? Well, there was No in the home invasion, Your Honor. There was no evidence of that. Of course, as I said, the court sustained the defense objection when the government asked a question trying to tie No into the home invasion. So No not only did it sustain the objection, the witness never answered that question, and the court gave the proper cautionary instruction. The only other statement, it was really one or two sentences that came out about the BMW in the home invasion, is that Ty Van Do's wife, in the course of what I believe is very confusing testimony about BMWs in general, that black BMW and another BMW that the family had had, said that she had told the police that she believed that maybe the black BMW was involved in the home invasion because she couldn't think of any other thing, any other reason that there would be a home invasion. And that was the only statement about that. I should also point out that there was no objection to that testimony, and the defense attorney did not ask that that be stricken. Sometime later he did move for a mistrial, but as these little snippets of testimony were coming out, he did not object to them. And what evidence was there? Talk about instructions a little bit about the two conspiracies. What evidence was there tying the two crew members to the Barger conspiracy? Well, as to the crew members who were just involved in Oki, the testimony- Of course, Quark was one of them, right? Yes, Quark and Dufneau and Zong Nguyen, I believe his name is. I'm used to referring to them by their first names. Those were just crew members in Oki. We believe, as we argue, I believe this is in response to Quark's point in the brief, that it was fair to, based on, again, all the circumstances of that Oki robbery, to tie them to the larger conspiracy for a number of reasons. One is that they were involved in what we call the core activity. Not that they were organizers, but that they were involved in committing a crime, which was directly at the center of the Count 1 conspiracy, that is robbing Oki and helping to put these chips on the truck, which were then going to be delivered, transported, and sold, and they were, of course, going to get the benefits from that. They were all paid from the proceeds of the Oki robbery. In addition, there are several other factors about this particular robbery that we believe put them- I'm not sure I understood that. That tied them into what? I mean, I can see when you cover the robbery, I mean, I should have thought more, that he would presume that the goods would be transported, and eventually they would be sold, and that's sort of how these things work. So, fencing maybe is part of the process, maybe transportation may be part of the process, but how would this relate to other crimes? So, the broader conspiracy involving several years and quite a few locations, when there's no evidence at all that they participated, or that there is any communication to them about crimes other than this one episode. So, putting aside the instruction issue, which, of course, ties in, but just putting aside the instructions issue, where is there sufficient evidence? This Court has pointed to a number of factors that one can rely on, again, to make the inference that they're aware that this is more than a one-shot deal. There are two cases that the defendant cites in his brief, Brown and, oh my God, I'm not sure how you pronounce that, in which this Court actually has reversed convictions on that particular ground. And in those cases, the defendant had very peripheral roles, not only in the big conspiracy, the prior illegal doings, but even in the specific one that was at issue. And in the course of discussing those roles, the Court distinguished, especially in, oh my God, his role. One of those factors is... In this case, though, one of them is selected because he's large to tie up the guard, right? Well, he's like... It's pretty central, but that doesn't show that he's connected to a larger conspiracy, does it? I mean, I guess, and I appreciate your citation of cases, but I think Judge Kosinski's question is, what is there in this record, the evidence in the record that ties these two defendants, the crew members, to the larger... And if you said there's nothing, we just have to make an inference, that's a fine answer, but I'm interested in it, too. There's nothing in the record that ties them to the prior, to the other robberies. That's true. So what inferences, what do you think allows us to draw inferences in this record? First of all, that these were very well-planned robberies. They involved many people. They involved going to another state. They involved all their equipment. They involved doing this in the dead of night. They involved several planning meetings, all of which the crew members attended. They involved a large amount of stolen goods that had to be sold in order for them to benefit from it. All of that would suggest that this was not the only computer chip robbery these organizers had ever planned to do. Why is that? I mean, apparently you plan something well and that you have lots of meetings. Why does that suggest that this is one of several similar events? Well, I would suggest that that would be something... Why waste expertise? You know, once you do one robbery, you know, you... I mean, I don't know. Well, I believe that's true, that in order to do a robbery of this kind, you would have to have some expertise in sort of knowing how to pull it off successfully, which of course is important on the rewards you're going to get, but perhaps even more significantly, knowing what to do with all the material that you're going to rob. I mean, if that's true, no one would ever commit the first robbery. Well... Because you don't have expertise. But they might not do one of this scale. This is a large-scale robbery, again, involving 10 crew members and organizers and out-of-state, and I think it suggests that this is not the first time that it was done. Well, the point is, remarkably, you have two witnesses that count state's evidence, right? So it's not a situation where you have to put together the pieces entirely based on circumstantial evidence. You've actually got two people on the inside, and there was a meeting where they all said, oh, well, you know, this is hit number three, and we're going to go for five or ten, and welcome the board guys, you know, this is a moving thing. This is only the second stop along the line, or the first stop along the line, and we're going all the way. I mean, this is the kind of evidence that the government could have elicited from people who were present and could have said, given direct testimony as to this knowledge, but it's not there. You told me it's not there. No, that evidence is not there as to those crew members. As to the inferences, I read your brief, and there were inferences, but those inferences weren't argued to the jury, were they? All it said was, to convict of a conspiracy, you've just got to show one act. I joined it. I mean, the declination the jurors got was not the one you gave in your brief, was it? I don't believe that the summation went into that particular point. Okay. Okay, thank you. Thank you. The counsel, if you'll give me each a minute, if you wish to take it. Okay. Eugene Alovsky again, Your Honor, and I just wanted to offer Judge Wallace some help on the count one point. In fairness to the government, I can't believe I said those words, but I think the page that the government lawyer wanted to refer you to was actually the one page prior to the one. It's not in the supplemental record, but if you look in the excerpts of record of Mr. at page 416 in volume two, you'll see that some days later, after the first set of instructions were given by the judge, there were some closing arguments, and then the judge, in reaction to a subset of the closing arguments, gave some clarifying comments and did, at that point, say to the jury that count one charges a conspiracy. He didn't say 371 again. He said 2314. But the defense point, I think, is that it's really tough. There was no explicit instruction to the jury to sniff out that later discussion of conspiracy and paste it into the elements of 2314 so that when they're in the room looking at the evidence and the elements, they'd have that there in front of them. So that was the basis of our argument that this comment really did not do the job and that it really vitiated the jury instruction. Thank you, Mr. Alovsky. And on count two, I do want to say that I didn't ñ I neglected to say to the Court that the Schiabani decision did come before Lopez, and I'm not so sure that Schiabani would come out the same way if it were after Lopez once the issue arises that Lopez imposes a constraint on statutory construction. Thank you. Thank you. Okay. Ed Lockle, representing Zoom, Nguyen, one of the crew members. I just want to emphasize that it was part of the conspiracy to keep the crew members in the dark, and that's expressly testified to by one of the two primary cooperating witnesses, Thok Tran, in the April 3 transcript at 103 to 104. Transcript what? 4301 transcript, pages 103 to 04, and again at 112. And I corrected it in my reply brief when the government said it in their opening brief, and I have to correct it again because I heard it stated by the government in this argument. My client never was in a position to see goods loaded onto a truck for transportation anywhere. That's just something that the government has asserted, and I pointed out in my reply brief how there is no support for that in the record, and I cite the only place where it could have been to show that it was not in that place either. So I think the knowledge that my client had was even more limited than I think has been assumed. Thank you. I just wanted to follow up on Judge Thomas' comment with regard to the second aspect of the voucher and the second point. On that excerpt of Record 425, and it's in my brief, when we go down further, there's a reference to the plea agreement that says that, wouldn't that be saying whoever had a plea agreement with the United States could never be listened to, could never be considered because of their status, because of who they are? That's not true. We can't do that. That would be too easy. The problem here is that's referring to cases as telling this jury that they're not only just deciding this case. The implication of their decision would affect other cases in which there are plea agreements, and I believe that was improper. Thank you. So did you have anything else? Your Honor, with respect to Count 1, the sufficiency of the evidence, the government argued that the evidence that the brother, Huyen Nguyen, was a crew member or was a member of the conspiracy in the Highway 101 robbery was proof that he was not involved in the Oki robbery because the masters of this conspiracy used crew members only once, in only one crime. Taking the government at its word, I would suggest then that my client, at best, was only involved in this single incident, and as the government has now conceded, there is absolutely no evidence that they had presented below or argued below that he was involved in anything else. But he didn't have to have been involved in anything else. You can join an ongoing conspiracy for the last act and be held responsible for the whole thing if you know that's what you're doing. If you know that's what you're doing. And how do you know that? By what role you play in the conspiracy. This is not like the customs agent... Maybe he will tell you. I mean, that's good. You might say, look, we've had three or four, whatever, successful runs. Join the winning team. This is how people... But there is no evidence of that. None whatsoever. No, no, I understand what you're saying. Just the fact that he did not participate in the earlier event doesn't prove anything. But even from the government's own point of view of their case, if you're involved as a crew member in one, you're therefore not involved as a crew member in any other. If that's the government's theory of the case, and the one that was argued to the jury, I think it's fair to accept the government at its word. Okay, thank you. Thank you, Your Honor. Mr. Jerome? Thank you, Your Honor. Very briefly, I disagree with the government's position that it was unclear or a confusing testimony after the judge's objection about this home invasion robbery. At trial transcript 15169, the prosecutor herself asked, and you thought at a later period of time when it was the home invasion, it must have been about the particular black BMW. If there was any confusion given by the wife, the prosecutor made clear to the jury that she was bringing out evidence that tied trade-up dough to this home invasion robbery, and she repeated that error when she brought in the rebuttal testimony. I'll submit it on that, Your Honor. Okay. The case is signed. You'll stand for a minute. I thank counsel for help with a very difficult case. Thank you.
judges: Wallace, Kozinski, Thomas